**FEDERAL INSURANCE COMPANY,**
**Plaintiff,**

v.

**SANFATEX, INC., Hartford Underwriters Insurance Company and Hartford Accident & Indemnity Company, Defendants.**

**No. 3:94–CV–74–H–3.**

United States District Court,
E.D. North Carolina,
Western Division.

Sept. 14, 1995.

Peter M. Foley, Ragsdale, Liggett & Foley, Robert V. Bode, Raleigh, NC, for plaintiff.

Michael T. Medford, Manning, Fulton & Skinner, Raleigh, NC, for defendants.

## *ORDER*

MALCOLM J. HOWARD, District Judge.

This matter is before the court on cross and counter motions for summary judgment filed by the plaintiff Federal Insurance Company ("Federal"), defendant Sanfatex, Inc. ("Sanfatex"), and defendants Hartford Underwriters Insurance Company ("Hartford Underwriters") and Hartford Accident & Indemnity Company ("Hartford Accident") jointly. The underlying action upon which these motions are premised is a request for declaratory judgment filed by the plaintiff seeking a determination of the party's rights and obligations to pay a settlement of $415,-000 to Ronald Sykes ("Sykes"), an injured employee of the defendant Sanfatex.

In a mediation conference conducted prior to the present action, Federal, Sanfatex, Hartford Underwriters and Hartford Accident agreed that $415,000 would be paid to Sykes in settlement of a civil intentional tort action filed by Sykes against Sanfatex. In addition, the parties agreed that $782,669.09 would be paid to Sykes in settlement of a workers' compensation claim. Although the parties agreed that the workers' compensation claim would be paid by Hartford Underwriters, the parties did not agree as to who among them was liable for payment of the $415,000 civil settlement. Instead, the parties agreed to voluntarily participate in the present summary judgment action to determine ultimate responsibility.

## STATEMENT OF THE CASE

On January 8, 1991, Ronald Sykes was injured in an industrial accident in the course and scope of his employment ("the Accident"). At the time of the Accident, Sykes' employer, Sanfatex, was insured under three policies:

1. A workers' compensation and employers' liability policy ("WC/EL Policy") purchased from defendant Hartford Underwriters;

2. A comprehensive general liability policy ("CGL Policy") purchased from defendant Hartford Accident; and

3. A commercial excess umbrella policy ("Federal Policy") purchased from plaintiff Federal.

Following the Accident, Sykes filed two claims against his employer. First, Sykes brought a claim for workers' compensation benefits pursuant to Chapter 97 of the North Carolina General Statutes (the "Workers' Compensation Claim"). Second, Sykes filed a civil action against Sanfatex and Tommy Chong, Sykes' supervisor, in Robeson County Superior Court ("the Civil Action"). The Civil Action, an intentional tort claim, was possible in spite of the exclusivity of remedies provisions of the North Carolina Workers' Compensation Act ("the Act") due to the North Carolina Supreme Court's 1991 ruling in *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222 (1991). *Woodson* allows an injured employee to pursue a civil action against an employer in addition to the employee's workers' compensation claim if the employer "intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct." *Woodson,* 329 N.C. at 340–41, 407 S.E.2d at 228.

Both Sykes' workers' compensation claim and his intentional tort claim were eventually settled: The Workers' Compensation Claim for $782,669.09 and the Civil Action for $415,-000. Hartford has already paid Sykes (or will pay as it comes due) the $782,669.09 for

his workers' compensation claim. That claim is not a part of the present dispute.

The present controversy involves the $415,000 settlement of the Civil Action. Although the parties agreed that Sykes should receive $415,000 for his intentional tort claim, the parties did not agree as to who should ultimately pay the $415,000, i.e., Sanfatex, Federal, Hartford Accident or Hartford Underwriters.

## DISCUSSION

### I. *Summary Judgment*

It is uncontroverted that this matter is ripe for decision on summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties have signed a stipulation agreeing to the uncontested facts and have exhaustively briefed the legal issues raised in this matter. As there appear to be no material factual issues in dispute, summary judgment is appropriate and the court will consider the issues raised in this case.

### II. *The Applicable Insurance Policies*

At the time of Sykes' accident, Sanfatex was covered under three insurance policies. The applicability of these policies to Sykes' settlement amounts is the basis of this dispute.

#### A. *The WC/EL Policy*

The most important policy in this action is the workers' compensation and employers' liability policy ("WC/EL Policy") issued by Hartford Underwriters. This policy provides Sanfatex with two separate types of coverage: Part One is workers' compensation insurance and Part Two is employers' liability insurance. Pursuant to Part One, Hartford Underwriters will pay Sykes a total of $782,-669.09 in settlement of his workers' compensation claim.

Similar to Part One, Part Two of the WC/EL Policy provides coverage for bodily injury arising out of and in the course of an injured employee's employment by the insured. However, Part Two excludes from its coverage obligations imposed by workers' compensation laws. Thus, Part Two provides coverage distinct from that provided by Part One. In addition, while Part One contains no stated policy limit, Part Two of the WC/EL Policy expressly limits Hartford's coverage under the employers' liability section to $500,000 per accident. It was pursuant to Part Two of the WC/EL Policy that Hartford acknowledged coverage of Sykes' Civil Action and provided Sanfatex with a defense to the action without issuing any reservation of rights.

#### B. *The CGL Policy*

The second policy covering Sanfatex at the time of Sykes' accident is the CGL Policy provided by Hartford Accident. The CGL Policy covers Sanfatex for those sums Sanfatex might become obligated to pay as damages because of bodily injury or property damage. However, the policy excludes from coverage any bodily injury to an employee of the insured arising out of and in the course of employment by the insured. It is not disputed that Sykes' injury occurred during the course of his employment with Sanfatex; thus, the CGL Policy is not applicable to the present dispute.

#### C. *The Federal Policy*

The third policy covering Sanfatex at the time of Sykes' accident is an excess umbrella policy provided by Federal Insurance Company. Coverage A of the Federal Policy provides excess coverage over the employers' liability section of the WC/EL Policy and over the entire CGL Policy. The Federal Policy does not provide excess coverage over the workers' compensation section of the WC/EL Policy. Coverage B of the Federal Policy applies to all damages for bodily injury not covered by the policies listed on the Schedule of Underlying Policy (umbrella coverage). Coverage B specifically excludes from its coverage any liability of an insured arising out of injury during the course of employment. Thus, Coverage B is not applicable to the present dispute.

Because the CGL Policy and Coverage B of the Federal Policy do not apply to workplace injuries, the only insurance policies applicable to the present dispute are Hartford Underwriters' WC/EL Policy, Part One and

Part Two, and Federal's Coverage A as it pertains to the employers' liability section of the WC/EL Policy. It is undisputed that each of these policies was in effect on the date of the underlying accident.

### III. *The Woodson Case*

Shortly after Sykes was injured while employed by Sanfatex, Sykes filed two claims against his employer. The first claim was for workers' compensation benefits pursuant to Chapter 97 of the North Carolina General Statutes. The second was a civil action based on a claim of intentional tort. As already stated, this second action was possible in spite of the exclusivity of remedies provisions of the Workers' Compensation Act because of the 1991 case of *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991).

In *Woodson*, the Supreme Court of North Carolina held,

> when an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct, that employee ... may pursue a civil action against the employer. Such misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the [Workers' Compensation] Act.

*Woodson*, 329 N.C. at 340–41, 407 S.E.2d at 228 (1991). Thus, a plaintiff in North Carolina may now simultaneously pursue a workers' compensation claim and a civil intentional tort claim without being required to elect between them. Sykes' second action against Sanfatex, the claim from which this dispute arose, was premised on *Woodson*.

The regulation of insurance is a function of the states. *State ex rel. Commissioner of Insurance v. North Carolina Rate Bureau*, 300 N.C. 381, 269 S.E.2d 547 (1980). Contracts insuring property, lives or interests located in North Carolina are subject to the laws of North Carolina. N.C.Gen.Stat. § 58–3–1 (1994). As this action involves questions concerning contracts insuring the interests of Sanfatex, a North Carolina corporation, this court is bound by the laws of North Carolina, including *Woodson*.

■ Because *Woodson* actions are relatively new to the North Carolina court system, two issues of first impression are presented by the dispute concerning Sykes' settlements. The first issue relates to the *Woodson* court's discussion of how an injured worker may recover both workers' compensation benefits and a civil tort judgment. In *Woodson*, the court stated that it was "not inherently inconsistent to assert that an injury caused by the same conduct was both the result of an accident, giving rise to the remedies provided by the [Workers' Compensation] Act, and an intentional tort, making the exclusivity provision of the Act unavailable to bar a civil action." *Woodson*, 329 N.C. at 349, 407 S.E.2d at 233. The court also stated that "[a]llowing an injured worker to pursue both avenues to relief does not run afoul of the goal of the election doctrine, which is to prevent double redress of a single wrong." *Id.* The court then concluded,

> Although the worker may pursue both statutory and common law remedies, *the worker ultimately is entitled to only one recovery. Double recovery should be avoided by requiring the claimant who recovers civilly against his employer to reimburse the workers' compensation carrier to the extent the carrier paid workers' compensation benefits, or by permitting the carrier to become subrogated to the claimant's civil claim to the extent of benefits paid.*

*Id.* (citations omitted) (emphasis added). It is this language from the *Woodson* opinion that has created the dispute presently before the court.

### IV. *Hartford's Position*

Based on the foregoing emphasized language from the *Woodson* opinion, Hartford Underwriters (hereinafter "Hartford") asserts that it is entitled, as the workers' compensation carrier, to a credit from any civil recovery Sykes might receive. Hartford further contends that because of this "credit" the $500,000 limit under the employers' liability section of its WC/EL Policy has been exhausted, leaving Hartford with no further obligation to Sanfatex. Essentially, Hartford

has adopted the position that in a *Woodson* claim each dollar paid under the workers' compensation section of the WC/EL Policy reduces the available coverage under the employers' liability section of the same policy.

In support of Hartford's contention that it has no further obligation to Sanfatex, Hartford compares the settlement of Sykes' two claims to a civil verdict for the same amount. Hartford argues, "[t]he situation presented is the same as if the Sykes Action had gone to trial and generated a verdict in the amount of $1,197,669.09. This sum represents the employer's total civil liability to Sykes." (Hartford's Br. in Supp. of Mot. for Summ. J. at 11). Hartford further states that if Sykes had recovered a verdict for $1,197,669.09, "Hartford Underwriters would be obligated to pay only $500,000 of the employer's liability, with Sanfatex or Federal bearing the remaining $697,669.09." *Id.*

This court does not disagree with Hartford's contention that had Sykes received a civil verdict for $1,197,669.09 Hartford would have been liable for only the first $500,000. However, Hartford's argument does not end there. Hartford further contends that because it has already paid Sykes $782,669.09 in workers' compensation benefits, it owes Sykes $0 under the employers' liability section of its WC/EL Policy. Hartford states, "[t]he Workers Compensation benefits actually paid by Hartford Underwriters, per the *Woodson* Credit ... mean[ ] that Hartford Underwriters has already paid the first $782,669.09 of the employer's liability, leaving only $415,000 for the employer to pay. In other words, Hartford Underwriters, by virtue of the workers' compensation benefits paid, has extinguished the first $782,669.09 of the employer's liability to Sykes." *Id.*[1]

The problem this court sees with Hartford's application of *Woodson* to the Sykes settlement amounts is that Sykes did not go to trial and generate a verdict in the amount of $1,197,669.09. Instead, Sykes filed two separate actions against Sanfatex—a workers' compensation claim and an intentional tort claim, both of which were settled for separate amounts. More importantly, however, these claims appear to have been settled as a package deal with $782,669.09 specifically allocated as workers' compensation benefits and $415,000 specifically allocated as settlement of the Civil Action.

Because Sykes' claims were specifically designated part workers' compensation and part civil recovery, Hartford's analogy to a verdict for $1,197,669.09 is flawed. A civil jury verdict for $1,197,669.09 would be covered under the employers' liability section of the WC/EL Policy and subject to the $500,000 limit. The reality, however, is that Sykes did not receive a jury verdict; instead, he received two settlements totalling $1,197,669.09 with only a portion of the settlement, more specifically $415,000, allocated as civil recovery. Thus, only $415,000 of the settlement falls under the employers' liability section of the WC/EL Policy. The remaining $782,669.09 is covered by the workers' compensation section of the policy. This is in accord with the fact that Hartford has agreed to pay Sykes $782,669.09 under the workers' compensation section of its policy and was defending the Civil Action under the employers' liability section when that claim was settled.

The WC/EL Policy is very clearly broken down into two separate sections, Part One and Part Two. An insured who purchases coverage from Hartford under the WC/EL Policy contracts with Hartford for two distinct types of coverages: Part One, covering workers' compensation claims, and Part Two, covering employers' liability other than work-

---

1. Hartford correctly recognizes that "the situation here presented is not the same as, or governed by, the provisions of N.C.Gen.Stat. § 97–10.2. That statute creates a mechanism whereby a workers' compensation carrier may recover the amounts paid in compensation from a third party tort-feasor who is responsible for the injury to the employee." (Resp. to Mot. for Summ. J. by Sanfatex and Federal at 11). In addition, Hartford accurately recognizes that "this situation is not governed by the decision in *Manning v. Fletcher*, 324 N.C. 513, 379 S.E.2d 854 (1989)." *Id.* In *Manning*, the Supreme Court of North Carolina allowed an insurance company's underinsured motorist coverage obligation to be reduced by payments made to the insured pursuant to the Workers' Compensation Act but only because the policy specifically stated that such a reduction would be allowed.

ers' compensation. The Policy provides, in part,

3.A. Workers Compensation Insurance: *Part One* of the Policy applies to the workers compensation law of the states listed here: NC

B. Employers Liability Insurance: *Part Two* of the policy applies to work in each state listed in item 3.A. The limits of our liability *under Part Two* are:

Bodily Injury By Accident $500,000 each accident

(First Am.Compl., Ex. 2) (emphasis added). Nowhere does the Hartford policy expressly state that the limitation under Part Two can be offset by payments made pursuant to Part One.

"The meaning of language used in an insurance contract is a question of law for the court, ... as is the 'construction and application of the policy provisions to the undisputed facts.'" *United States Fidelity and Guaranty Co. v. Country Club of Johnston County*, 119 N.C.App. 365, 458 S.E.2d 734, 738 (1995) (citations omitted) (quoting *Walsh v. National Indemnity Co.*, 80 N.C.App. 643, 647, 343 S.E.2d 430, 432 (1986)). "In addition, an insurance contract should be given the construction a reasonable person in the position of the insured understands it to mean." *Silvers v. Horace Mann Insurance Co.*, 90 N.C.App. 1, 8, 367 S.E.2d 372, 376 (1988), *aff'd as modified*, 324 N.C. 289, 378 S.E.2d 21 (1989). Furthermore, "[a]ny ambiguity in an insurance contract must be resolved in favor of the insured." *Durham City Board of Education v. National Union Fire Insurance Co. of Pittsburgh*, 109 N.C.App. 152, 156, 426 S.E.2d 451, 453 (1993) (citing *Maddox v. Colonial Life and Accident Insurance Co.*, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981)).

The plain language of the WC/EL Policy limits Hartford's liability under Part Two to $500,000. A reasonable person in the position of the insured would most likely understand this limit to pertain only to claims made pursuant to the employers' liability section of the policy. In the case presently before the court, only the *Woodson*-based claim falls under the employers' liability sec-

tion of the policy. Thus, although Hartford has already made payments totalling $782,-669.09, *none* of these payments have been made under the employers' liability section of Hartford's policy. Hartford has therefore not exhausted its $500,000 employers' liability limit and Hartford should be required to pay Sykes the full $415,000. To hold otherwise would effectively eliminate Sanfatex's bargained for protection under the employers' liability section of the WC/EL Policy.

## V. *The Reimbursement Issue*

■ Once it is determined that Hartford is liable to Sykes for the $415,000 civil settlement, a second issue is raised by *Woodson*. The issue is whether *Woodson* requires that Hartford, as the workers' compensation carrier, be reimbursed for $415,000 once this amount is paid to Sykes since Hartford paid greater than that amount in workers' compensation benefits.

In reading *Woodson*, it is clear that the *Woodson* court was concerned that a plaintiff not be allowed to recover twice for a single injury; once in workers' compensation benefits and a second time in a civil action. Thus, the *Woodson* court stated that a plaintiff who recovers civilly against his employer must "reimburse the workers' compensation carrier to the extent the carrier paid workers' compensation benefits, or by permitting the carrier to become subrogated to the claimant's civil claim to the extent of benefits paid." *Woodson*, 329 N.C. at 349, 407 S.E.2d at 233. The impetus behind the *Woodson* court's reimbursement language appears to have been a concern with the scenario of a claimant who pursues a civil action and receives a settlement or a verdict that in no way takes into consideration amounts already received as workers' compensation benefits. Such a scenario certainly creates the potential for double recovery.

In the dispute presently before us, however, the claims appear to have been settled in light of one another, that is, Sykes' civil action was settled for only $415,000 because he was already receiving over $700,000 in

workers' compensation benefits.[2] Consequently, the threat of double recovery has been negated and the combined amount of $1,197,669.09 is a single recovery. Although Hartford has stated that it is not "seeking subrogation or ... in any way, seeking to recover any sum from any person," Hartford's Br. in Resp. to Mot. for Summ. J. at 11, this court finds that Hartford could not seek reimbursement from Sykes for any workers' compensation benefits paid were it to attempt to do so in the future.

## CONCLUSION

For the reasons set forth above, this court finds that Hartford Underwriters is liable under the employers' liability section of its WC/EL Policy for the previously settled upon amount of $415,000, to be paid to Ronald Sykes in settlement of his Civil Action against Sanfatex. This court further finds that Hartford Underwriters may not seek reimbursement from Sykes for workers' compensation benefits paid.

Accordingly, the court hereby GRANTS the summary judgment motions of plaintiff Federal Insurance Co. and defendant Sanfatex, Inc. as to the liability of Hartford Underwriters under its WC/EL Policy and DENIES the summary judgment motion of Hartford Underwriters and Hartford Accident. This action is therefore DISMISSED and the clerk is directed to close this case.

---

**2.** *See e.g., Sanfatex's Br. in Supp. of Mot. for Summ. J.,* at 29 ("Since the Worker's Compensation Claim and the Sykes Action were settled together as a package ..."); *Pl.'s Mem. in Opp'n* to Hartford's Mot. for Summ. J., at 4 ("If, as Hartford concedes, Sykes total damages are $1,197,669.09 ...").